# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| v. | : Hon. Cathy L. Waldor |
| JAMES MAGINN | : Mag. No. 19-7465 |
| | : **CRIMINAL COMPLAINT** |

I, Joseph Patricola, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the United States Department of Labor, Office of the Inspector General, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached page and made a part hereof.

Joseph Patricola, Special Agent
U.S. Department of Labor
Office of the Inspector General

Sworn to before me and subscribed in my presence,
October 29, 2019, at Newark, New Jersey

HONORABLE CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

## **COUNT ONE**
### (Conspiracy to Commit Health Care Fraud)

From at least as early as in or around January 2017 through in or around March 2018, in the District of New Jersey, and elsewhere, defendant,

**JAMES MAGINN,**

knowingly and intentionally conspired and agreed with others to execute a scheme and artifice to defraud the Victim Fund, a health care benefit program as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

**ATTACHMENT B**

I, Joseph Patricola, am a Special Agent with the United States Department of Labor-Office of the Inspector General ("DOL-OIG") in the Office of Labor Racketeering and Fraud Investigations, and a Task Force Officer with the Federal Bureau of Investigation (FBI"). I have knowledge of the following facts based upon both my investigation and discussions with other law enforcement personnel and others. Because this affidavit is being submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not included each and every fact known to the government concerning this matter. Where statements of others are set forth herein, these statements are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## The Defendant and His Health Care Companies

1. At all times relevant to this Complaint:

    a. The victim fund in this case (the "Victim Fund") is one of the largest labor-management funds in the United States. The Victim Fund provides a range of comprehensive benefits to over 400,000 working and retired health care industry workers and their families ("Members"), specifically to one of the largest health care unions in the United States. The Members enjoy complete health benefits at little or no cost. The Victim Fund is a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

    b. Defendant JAMES MAGINN ("MAGINN") resides in Queens, New York and has held the following positions: (1) president and owner of Clear Diagnostic Solutions, Inc. ("Clear Diagnostic"); (2) owner of Preventive M Services, LLC (a/k/a Preventive Medical Services) ("Preventive M"); and (3) manager of a medical services company known to law enforcement ("Medical Company-1"). MAGINN holds no professional licenses.

    c. Clear Diagnostic is a privately held company registered with the New York Department of State. It is a participating provider in three healthcare benefit plans (the "Three Plans") offered by the Victim Fund.

    d. Preventive M is a limited liability corporation, registered with the New York Department of State. Preventive M has used the website

3

www.preventivemedicalservice.com to advertise on the Internet as a "mobile medical company" founded by doctors who provide "early medical treatment" and "preventive medical care."

    e.  Medical Company-1 is a professional corporation registered with the New York Department of State.  It is also a participating provider in Three Plans offered by the Victim Fund.  Medical Company-1's owner is a medical doctor ("Doctor Witness-1") who practices out of an office in Hazlet, New Jersey.

    f.  Doctor Witness-1 was an affiliated provider with both Clear Diagnostic and Medical Company-1.

### The Scheme to Defraud

  2.  From in or around 2014 through in or around April 2018, Doctor Witness-1 read and interpreted patients' medical diagnostic tests provided to Doctor Witness-1 by MAGINN through MAGINN's companies – Clear Diagnostic and Preventive M.  To facilitate the process of billing for Doctor Witness-1's services, MAGINN and Doctor Witness-1 formed Medical Company-1.  Pursuant to a Management Services Agreement executed between MAGINN and Doctor Witness-1, MAGINN was responsible for billing and management for Medical Company-1.  Medical Company-1 had no other employees.

  3.  Beginning in or around August 2017, MAGINN and other co-conspirators, known and unknown, initiated a scheme whereby they used Clear Diagnostic and Preventive M to set up health and wellness fairs for large numbers of patients.  The health and wellness fairs were conducted for the Members of the Victim Fund who worked at various health care facilities and nursing homes.

  4.  Between in or around August 2017 and in or around April 2018, MAGINN, through Clear Diagnostic and Preventive M, sent Doctor Witness-1 thousands of diagnostic tests conducted on the Members at the health and wellness fairs.  Doctor Witness-1 interpreted results for ultrasounds of the abdominal aorta, vascular studies of veins and arteries off the arms and legs, transcranial dopplers, carotid dopplers, and echo-cardiograms.

5. Doctor Witness-1 never physically examined any Members on-site at any of the Victim Fund's health and wellness fairs. He never attended a health and wellness fair for the Victim Fund and never met any of the Member patients. Doctor Witness-1 interpreted all examination results remotely from his office in New Jersey.

6. MAGINN billed all of Doctor Witness-1's work interpreting examinations for Members to the Victim Fund through Medical Company-1.

7. In order for the Victim Fund to issue payments on the claims for medical services submitted by MAGINN, the services must be medically necessary. The medical services must: (1) be consistent with the diagnosis and treatment of the patient's condition; (2) be in accordance with the standards of acceptable medical practices; (3) not be solely for the convenience of the patient; (4) be performed at a level of care not greater than required for the patient's condition; (5) result in a measurable and ongoing improvement in the patient's health; and (6) result in a change in diagnosis or proposed treatment plan. Claims must also accurately indicate where the medical services were rendered.

8. Between in or around November 2017 and July 2018, MAGINN and Doctor Witness-1 exchanged hundreds of text messages. The text messages show that MAGINN was responsible for sending patient test results to Doctor Witness-1 and billing for Doctor Witness-1's services, and that MAGINN had access and control to the billing systems used by Clear Diagnostic and Preventive M. For example, in or around November and December 2017, MAGINN texted Doctor Witness-1 the following: (a) "I just emailed you all the medical records for [Patient-1];" and (b) "[C]an you read an echo tonight for [Patient-2]." If Doctor Witness-1 had any issues with the tests he was being asked to interpret, then Doctor Witness-1 would direct the questions to MAGINN. For example, on or about March 19, 2018, Doctor Witness-1 sent the following text message to MAGINN: "Jim – a lot of the venous Doppler studies were poor because the tech didn't use the color flow and a lot were only of 1 extremity. Please tell them they have to use color flow and bilateral studies when ordered." Similarly, on or about April 10, 2018, Doctor Witness-1 texted MAGINN the following: "A whole bunch of arterial upper extremity . . . are only of the right arm and are not bilateral studies."

9. In or around April 2018, as a result of the health and wellness fairs conducted by MAGINN and the other co-conspirators, Doctor Witness-1

received a significant increase in the number of readings that he was conducting for MAGINN and MAGINN's companies. In fact, on or about February 27, 2018, MAGINN sent Doctor Witness-1 a text message informing Doctor Witness-1 that he was "going to start to see a big jump in billing and collections. We are booking events currently through April. 90% commercial insurance." On or about March 17, 2018, MAGINN again informed Doctor Witness-1 that "[t]hings are picking up nicely. You will start to see a lot more billing."

10. In or around April and May 2018, Doctor Witness-1 also noticed that MAGINN was using inaccurate billing codes, which indicated that the tests being conducted on the Members were necessary, when, in fact, many of the tests being performed for the Members were not necessary given their health characteristics. For example, on at least one occasion, Doctor Witness-1 received from MAGINN examination results for a 25-year-old Member who had been given several tests that were unnecessary for a person that age.

11. On or about May 15, 2018, Doctor Witness-1 asked MAGINN about the inaccurate billing. Specifically, Doctor Witness-1 sent the following text to MAGINN: "Hi Jim. A lot of studies being done on the same patient. What insurance coverage and where are you uploading the medical notes so I can see the medical necessity?" That same day, MAGINN responded: "They are all [Victim Fund] patients they request to do all tests. The objective is to give them back as many reports as possible. We don't bill everything." Doctor Witness-1 then responded: "We should still have the medical necessity and the test requisition signed by the doctor." MAGINN replied: "That's being done[.] I'll get them to you soon." Law enforcement confirmed that Doctor Witness-1 never received the requested materials with respect to medical necessity from MAGINN.

12. From in or around January 2017 through in or around March 2018, the Victim Fund's Fraud and Abuse Department (the "FAD") received referrals from multiple internal and external sources related to an upward trend of high-dollar payments to select providers for conducting multiple diagnostic tests on Members of the Victim Fund. The FAD received multiple external member complaints regarding, among others, Clear Diagnostic, Preventive Medical, and Medical Company-1.

13. On or about March 26, 2018, the FAD opened an internal investigation into the complaints and assigned a private investigator (the "PI")

to conduct a complete review of the referrals and complaints. As a result of the Victim Fund's internal investigation and subsequent civil litigation, MAGINN ceased sending examinations to Doctor Witness-1. On or about January 21, 2019, MAGINN texted Doctor Witness-1 the following:

> We are pretty much on hold until this issue gets resolved. We are having a meeting later this week with the lawyers and I'm going to tell them I want the opportunity to resubmit corrected claims. It's 100% obvious there was a billing mistake made. Every claim went out with the same DX [diagnosis code]. I want to resubmit every claim with the appropriate DX from the medical notes with the right place of service 15 not 11 and use the appropriate DX . . . .

14.  Law enforcement confirmed with the Victim Fund that it never received resubmitted claims from MAGINN.

15.  The PI's Report of Investigation, dated December 5, 2018, revealed a pattern and practice of fraudulent billing by MAGINN.

16.  Specifically, between in or around January 2017 and March 2018, Clear Diagnostic submitted over 11,000 claims to the Victim Fund for Members for which Doctor Witness-1 was the rendering provider. Of those claims, there were approximately 900 claims for establishing new patients, approximately 664 claims for nerve conduction studies, and approximately 161 claims for allergy skin tests, even though Doctor Witness-1 did not establish new patients, did not conduct any nerve conduction studies, and did not conduct any allergy testing for any of the Members. Additionally, during that same time period, Medical Company-1 submitted over 900 claims to the Victim Fund for Members for which Doctor Witness-1 was the rendering provider. Of those claims, there were approximately 98 claims for nerve conduction studies and approximately 32 claims for allergy skin tests, even though Doctor Witness-1 did not conduct any allergy testing or nerve conduction testing for any Members. Additionally, all claims submitted by MAGINN through Clear Diagnostic and Medical Company-1 used place of Service Code 11, which represented to the Victim Fund that services had been rendered in the providing physician's office, despite that fact that Doctor Witness-1 interpreted all examinations for Members remotely from his office in New Jersey.

17.     The claims submitted by Clear Diagnostic and Medical Company-1 to the Victim Fund indicated that nearly every Member treated at the health and wellness fairs had the same complaint or symptom. For example, over 80 percent of the Members were given the same principal diagnosis of headache, cough, dizziness, or general muscle weakness. Over 90 percent of the Members were ordered to undergo the same diagnostic testing. MAGINN, through Clear Diagnostic and Preventive M, had represented to the Victim Fund that the health and wellness fairs were to provide preventive medical services. However, preventive screening diagnosis billing codes were not used. MAGINN misrepresented diagnosis codes to the Victim Fund in order to justify the ordering of the many unnecessary diagnosis tests.

18.     FBI and DOL-OIG agents conducted a separate analysis of the claims data and reports collected by the PI. The data and reports confirm that all services were provided on-site at the Members' place of employment at the health and wellness fairs set up by MAGINN and the co-conspirators, not at a physician's office, as MAGINN's submitted claims indicated. Thus, MAGINN's use of Service Code 11, claiming that services had been rendered in a physician's office, was a false representation.

19.     Additionally, the FBI's and DOL-OIG's review of the data and reports obtained by the PI confirmed that the majority of the Members were not sick nor did they complain of any illnesses, pain, or other health complications on the days they received treatment at the health and wellness fairs.

20.     For example, approximately eight Members were interviewed between on or about May 5, 2018, and May 24, 2018. The claim forms for all eight Members submitted to the Victim Fund by MAGINN indicated that, at the time that they were examined, they had been suffering from some sort of illness or had some sort of medical complaint. However, all eight Members stated during the interviews that they had not been sick when they attended the health and wellness fairs, but rather were told by their employers they were to attend as part of their annual physicals and job-related preventive services. Each of the eight Members confirmed that all medical services had been rendered at their place of employment, and not at a physician's office.

21.     Additionally, based on my training and experience investigating health care and other fraud, it is highly improbable that every Member who attended the health and wellness fairs would have had the same chief complaint or symptom. It is similarly improbable that over 90 percent of the Members would require the same diagnostic testing. Contrary to MAGINN's assertion that all testing was medically necessary, based on my training and experience, a review of the claims data submitted to the Victim Fund shows that it was not. Furthermore, despite MAGINN's claim that the health and

8

wellness fairs provided preventive medical services, MAGINN did not use preventive diagnosis codes when he submitted these claims. Rather, MAGINN falsely submitted misrepresented diagnosis codes to justify the ordering of diagnostic tests, which were, in fact, not necessary, in order to receive payment for the unnecessary testing.

22. Thus, MAGINN's submission of claims to the Victim Fund indicating that over 80 percent of the Members were suffering from headaches, coughs, dizziness, or general muscle weakness was also a false representation. Similarly, his submission of claims for unnecessary diagnostic testing for over 90 percent of the Members was also false.

23. As a result of his false representations, MAGINN caused the Victim Fund to issue overpayments in the amounts of approximately $2,684,261 to Clear Diagnostic/Preventive Medical, and approximately $196,175 to Medical Company-1.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Cathy L. Waldor |
| v. | : | Mag. No. **19-7380** |
| JASON M. TORRES | : | **ORDER FOR A CONTINUANCE** |

This matter having come before the Court on the joint application of Craig Carpenito, United States Attorney for the District of New Jersey (by Anthony P. Torntore, Assistant United States Attorney), and defendant Jason M. Torres (by Jordan Morgenstern, Esq.), for an order granting a continuance of the proceedings in the above-captioned matter from the date this Order is signed through **December 31, 2019** to permit defense counsel the reasonable time necessary for effective preparation in this matter and to allow the parties to conduct plea negotiations, and the defendant being aware that he has the right to have the matter submitted to a grand jury within 30 days of the date of his arrest pursuant to Title 18, United States Code, Section 3161(b); and the defendant, through his attorney, having consented to the continuance; and for good and sufficient cause shown,

IT IS THE FINDING OF THIS COURT that this action should be continued for the following reasons:

(1) Plea negotiations are currently in progress, and both the United States and the defendant seek additional time to achieve successful resolution of these negotiations, which would render any grand jury proceedings and any subsequent trial of this matter unnecessary;